# IN THE COURT OF APPEALS OF IOWA

No. 22-1261
Filed December 7, 2022

**IN THE INTEREST OF C.C., and J.C.,**
**Minor Children,**

**M.B., Mother,**
        Appellant.
_____

Appeal from the Iowa District Court for Wapello County, William Owens, Associate Juvenile Judge.

A mother challenges juvenile court intervention and the court's finding her children are in need of assistance. **AFFIRMED.**

Patricia J. Lipski, Washington, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Jonathan Willier, Centerville, for appellee father.

Samuel K. Erhardt, Ottumwa, attorney and guardian ad litem for minor children.

Considered by Bower, C.J., and Greer and Badding, JJ.

**BOWER, Chief Judge.**

A mother challenges juvenile court intervention; the court's finding that her children, J.C. (born January 2015) and C.C. (born April 2016), are children in need of assistance (CINA); and the children's placement with their paternal grandfather. On our de novo review, we find clear and convincing evidence the children would be imminently likely to suffer harmful effects as a result of the mother's failure to exercise a reasonable degree of care in supervising the children should they be returned to her care. We affirm the finding the children are CINA as defined in Iowa Code section 232.2(6)(c)(2) (2022).[1]

The department of health and human services (DHHS) became involved with the mother and her two children the evening of March 3, 2022, when the mother reported J.C. had disappeared after being left outside in the cold to play. J.C. was eventually located some distance from the family home without a coat and taken to the law center. When the mother arrived at the law center, her demeanor was inconsistent with what occurred, as she was quick to anger and just as quick to calm down. Law enforcement were concerned about the mother's initial lack of cooperation, her heightened emotions, and her "pinpoint" pupils. The mother tried to leave with the children, but officers were able to keep her there and contacted DHHS. The on-call DHHS worker, Sunny Allison, arrived and noted the mother did not interact with the children; rather, she left them to be supervised by

---

[1] Section 232.2(6)(c)(2) defined a CINA as an unmarried child "[w]ho has suffered or is imminently likely to suffer harmful effects as a result of . . . [t]he failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child." A statutory reorganization moved the provision for the adjudication of a child in need of assistance to a new section, with this ground for adjudication now found at Iowa Code section 232.96A(3)(b) (Supp. 2022).

officers at the law center. Allison felt the mother's variable emotions and behaviors suggested either substance use or a mental-health concern. The mother expressed to law enforcement and Allison that she did not know why anyone was concerned about J.C.[2] She would not allow Allison to visit the family home for a safety check and would not consent to drug testing. After several hours, the mother did agree to a safety plan that temporarily placed the children with their paternal grandfather.

Kathy Blazina, the child protection worker, contacted the paternal grandfather a few days later, and the grandfather reported the children were doing well. He also stated he and his son, the children's father, had discussions about the father taking the children back to the father's home in Alabama. DHHS did not know if there was an existing custodial order and did not offer any legal advice.

The father did come to Iowa and took the children home to Alabama. DHHS asked him to return the children after a custodial order from 2017 in Texas was presented and determined to be in place. Despite promises to do so, the father did not return the children.

A temporary removal order was entered on March 31.

The father reported he was financially unable to return the children; he was eventually charged and arrested for violation of the custodial order. On April 6, Blazina and the grandfather flew to Alabama to return the children to Iowa.

At the May 4 and 18 CINA adjudication hearings, Blazina testified that while at the airport arranging to take custody of the children, she received a call from the

---

[2] Allison later learned J.C. has a learning disability and had been left outside supervised only by the younger C.C.

mother. She told the mother what had transpired and that she was on her way back to Iowa with the children. Blazina stated she had had appropriate conversations with the mother at her home in Iowa, but this telephone conversation left her concerned about the mother's mental health or substance use. The mother said she was in Kansas and was on her way to Alabama to take custody of J.C. and C.C. Yet, she would not believe the children were in Alabama and maintained the children had never left Iowa.

Blazina testified she completed her child abuse investigation and, based on her assessment of the family and the allegations, found a denial of critical care and lack of supervision. The ongoing case was then reassigned to DHHS social work case manager Sydney Weldon.

Weldon met with the mother on April 8 and noted the mother appeared to be very confused about the juvenile court's ex parte removal order and the circumstances surrounding the children being placed with their paternal grandfather. Weldon had a phone conversation with the mother on April 15 to discuss having an interaction with the children. The mother advised she did not need to arrange for visits because she has a custodial order and the children had not been removed by court order and hung up.

The mother did participate in a visit on April 26, and Weldon had a phone conversation with her before the visit during which the mother became very upset. Later, during the mother's visit with C.C., the mother told the service provider she did not intend to allow the child to return to the paternal grandfather's home. The provider contacted Weldon, who came to the home with the court's ex parte order in hand. As Weldon approached, the mother got up from where she was sitting

with the child, went inside the house, locked the door, and refused to open it. Law enforcement was called, and they forced their way into the home and assisted Weldon in taking custody of the child. Weldon was concerned when C.C. showed no emotional response to the situation. The mother was taken into custody on a charge of interference with official acts.

At the May 4 adjudicatory hearing, Weldon testified the mother had not cooperated in efforts to schedule visits and had been unreachable since the April 26 visit. On May 18, Weldon testified she continued to have concerns about the mother's substance use or mental health. Weldon stated she attempted to offer in-home services but the mother is difficult to contact. The mother did not testify, though she filed a letter alleging the children were illegally removed from her care or kidnapped and asked for a dismissal of the CINA proceedings and that the children have no further involvement with services.

On June 1, the juvenile court found the children were at imminent risk of adjudicatory harm if returned to the mother's care, adjudicated both children as CINA, and confirmed the ex parte removal order. The court also found the least restrictive alternative for the children was for DHHS to have legal custody with placement in foster, relative, or other responsible adult care. The July 14 dispositional order continued that placement decision.

On appeal, the mother maintains she does not use drugs or alcohol, or have mental-health conditions which result in the children receiving inadequate care. She alleges the State has not made reasonable efforts to prevent the children's removal and "provided little to no information and no reunification services to the mother for nearly three weeks." She contends she did not see or speak to the

children for more than a month, and she did not know whether the children were safe and cared for. The mother asserts she is willing to participate in voluntary services so the juvenile proceedings are unnecessary and should be dismissed.

We review equity proceedings de novo. Iowa R. App. P. 6.907. We give weight to the court's factual findings, though we are not bound by them. Iowa R. App. P. 6.904(3)(g). "The most important consideration in any CINA case is the best interests of the child[ren]." *In re D.D.*, 653 N.W.2d 359, 362 (Iowa 2002).

At some point after seven-year-old J.C. was outside with five-year-old C.C. supervising, the mother realized J.C. was missing and called the police. Because she was uncooperative in giving information, law enforcement did not know how long the child had been missing. A concerned citizen called the police after seeing J.C. wandering around alone several blocks from home. It was cold, and J.C. had no coat. After the police found the child, they took him to the law center and called the mother. Considering the mother's telephone calls and her behavior when she came to the law center, the police were hesitant to return the child to her. She was uncooperative and initially would not give her name. The police were concerned she was under the influence of a substance or had serious mental-health issues and called DHHS to assess whether the child was safe in the mother's care. The mother was not cooperative with the DHHS worker either but eventually agreed to a safety plan placing the children with their paternal grandfather. She left the children before the grandfather arrived.

The mother maintained no problem existed with her parenting and would not consent to drug testing or a safety inspection of the home. She refused to participate with the preparation of social history, insisting the children had not been

adjudicated CINA; she persists in her belief the children have been illegally removed from her care.  She has not participated in the offered services.  *See In re H.R.K.*, 433 N.W.2d 46, 50 (Iowa Ct. App. 1988) (noting "requirement that the parents acknowledge and recognize the abuse before any meaningful change can occur is essential in meeting the child's needs"); *see also In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) (noting father failed to acknowledge his drug use despite strong evidence to the contrary).

We, like the juvenile court, find clear and convincing evidence supports a finding J.C. suffered harmful effects as a result of the mother's failure to provide appropriate supervision.  The evidence shows DHHS has attempted to provide services, but the mother has either rejected those offers or made herself unavailable to participate in them.  Her current assertion that she will participate in voluntary services carries little weight.  The children would face adjudicatory risk if returned to the mother's care at this time; continued removal is necessary to ensure the children's safety and is in the children's best interests.  We affirm.

**AFFIRMED.**